**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

City of Richmond;
900 East Broad Street
Richmond, VA 23219
*Plaintiff*,

v.

Frank A. Reichl;
82 Crenshaw Drive
Flanders, NJ 07836-4725, USA

Vincent J. Opalewski;
7 Beresford Place
Rockaway, NJ 07866-1322, USA

Brian C. Steppig;
17920 Lake Ridge Point
Alexander, AR 72002-9298, USA

Alex Avraamides
279 Maywood Avenue
Maywood, NJ 07607, USA

Amita Gupta
c/o BASF Corporation, 100 Park Avenue
Florham Park, NJ 07932

General Chemical Corporation;
90 East Halsey Road
Parsippany, NJ 07054, USA
Serve: The Corporation Trust
300 E. Lombard Street
Baltimore, MD 21202, USA

General Chemical Performance Products, LLC;
90 East Halsey Road
Parsippany, NJ 07054, USA
Serve: Corporation Trust Company
820 Bear Tavern Road
West Trenton, NJ 08628, USA

Civil Action No.:   3:17cv416

**JURY TRIAL DEMANDED**

General Chemical LLC;
90 East Hasley Road
Parsippany, NJ 07054, USA
Serve:  General Chemical LLC
90 East Halsey Road
Parsippany, NJ 07054

GenTek Inc.;
90 East Halsey Road
Parsippany, NJ 07054, USA
Serve: Edward E. Obstler
233 East Redwood Street
Baltimore, MD 21202, USA

Chemtrade Logistics Income Fund;
155 Gordon Baker Road, Suite 300
North York, M2H 3N5, Canada
Serve: Susan Pare, General Counsel &
Corporate Secretary
155 Gordon Baker Road, Suite 300
North York, M2H 3N5, Canada

Chemtrade Logistics Inc.;
155 Gordon Baker Road, Suite 300
North York, M2H 3N5, Canada
Serve: CSC-Lawyers Incorporating Service
Company
11 E. Chase Street
Baltimore, MD 21202, USA

Chemtrade Chemicals Corporation;
155 Gordon Baker Road, Suite 300
North York, M2H 3N5, Canada
Serve: Susan Pare, General Counsel &
Corporate Secretary
155 Gordon Baker Road, Suite 300
North York, M2H 3N5, Canada

Chemtrade Chemicals US, LLC;
1421 Wills Avenue
Syracuse, NY 13204, USA
Serve: CT Corporation System
4701 Cox Road, Suite 285
Glen Allen, VA 23060, USA

Chemtrade Solutions, LLC;
90 East Halsey Road
Parsippany, NJ 07054, USA
Serve: CT Corporation System
4701 Cox Road, Suite 285
Glen Allen, VA 23060, USA

GEO Specialty Chemicals, Inc.;
340 Mathers Road
Ambler, PA 19002-3420, USA
Serve: CT Corporation System
4701 Cox Road, Suite 285
Gelen Allen, VA 23060, USA

C & S Chemicals, Inc.;
4180 Providence Road, Suite 310
Marietta, GA 30062-6194, USA
Serve: Robert L. Chandler
4180 Providence Road, Suite 310
Marietta, GA 30062, USA

C & S Chemicals (of Georgia) Inc.;
4180 Providence Road, Suite 310
Marietta, GA 30062-6194, USA
Serve: Jean C. Chandler
4180 Providence Road, Suite 310
Marietta, GA 30062, USA

RGM Chemical, LLC;
4180 Providence Road, Suite 310
Marietta, GA 30062-6194, USA
Serve: Robert L. Chandler
4180 Providence Road, Suite 310
Marietta, GA 30062, USA

RGM of Georgia, Ltd.;
4180 Providence Road, Suite 310
Marietta, GA 30062-6194, USA
Serve: Robert L. Chandler
4180 Providence Road, Suite 310
Marietta, GA 30062, USA

USALCO, LLC;
2601 Cannery Avenue
Baltimore, MD 21226, USA
Serve: Resagent, Inc.
3190 Fairview Park Drive, Suite 300
Falls Church, VA 22042, USA

Delta Chemical Corporation
120 E. Baltimore Street, Suite 2100
Baltimore, MD 21202
Serve: James E. Baker, Jr., Esq.
120 E. Baltimore Street
Suite 2100
Baltimore, MD 21202)

Kemira Chemicals, Inc.;
1000 Parkwood Circle, Suite 500
Atlanta, GA 30339, USA
Serve: CT Corporation System
4701 Cox Road, Suite 285
Glen Allen, VA 23060, USA

Hawkins, Inc.;
1010 Dale Street N.
St. Paul, MN 55117-5603, USA
Serve: National Registered Agents, Inc.
1010 Dale Street N.
St. Paul, MN 55117-5603, USA

Southern Ionics, Inc.;
1250 Neosho Ave.
Baton Rouge, LA 70802, USA
Serve:  The Corporation Trust Inc.
351 West Camden Street
Baltimore, MD 21201, USA

and John Doe Nos. 1 – 50,
*Defendants*.

## COMPLAINT

**(Sherman Antitrust Act; Clayton Antitrust Act; Virginia Antitrust Act; Common Law Fraud, Breach of Contract, Restitution/Disgorgement/Unjust Enrichment, Under Virginia Law; Conspiracy; Compensatory Damages; Treble Damages; Injunctive Relief; Costs And Attorney's Fees)**

## JURY TRIAL DEMANDED

Jay N. Fastow
Justin W. Lamson
**BALLARD SPAHR LLP**
919 Third Avenue, 37th Floor
New York, NY 10022
(212) 223-0200

Edward D. Rogers
Jason A. Leckerman
**BALLARD SPAHR LLP**
1735 Market Street, 51st Floor
Philadelphia, PA 19103
(215) 665-8500

Constantinos Panagopoulos
(VA #33356)
**BALLARD SPAHR LLP**
1909 K Street, NW, 12th Floor
Washington, DC 20006
(202) 661-2200

*Attorneys for Plaintiff, City of Richmond*

Plaintiff, the City of Richmond ("Plaintiff," "Richmond," or "the City"), by and through its undersigned counsel, brings this action alleging claims, including claims of conspiracy, under the Sherman Anti-Trust Act, 15 U.S.C. § 1, *et seq.* and the Clayton Antitrust Act, 15 U.S.C.§§ 12-17 & 29 U.S.C. §§ 52-53 (Claim I); under the Virginia Antitrust Act, VIRGINIA CODE ANN. § 59.1-9.5 (Claim II); and under the common law of Virginia, for fraud (Claim III), breach of contract (Claim IV), and restitution/disgorgement/unjust enrichment (Claim V). Plaintiff Richmond alleges these claims against Defendants Frank A. Reichl; Vincent J. Opalewski; Brian C. Steppig; Alex Avraamides; Amita Gupta; General Chemical Corporation; General Chemical Performance Products, LLC; General Chemical LLC; GenTek Inc.; Chemtrade Logistics Income Fund; Chemtrade Logistics, Inc.; Chemtrade Chemicals Corporation; Chemtrade Chemicals US, LLC; Chemtrade Solutions, LLC; GEO Specialty Chemicals, Inc.; C & S Chemicals, Inc.; C & S Chemicals (of Georgia) Inc.; RGM Chemical, LLC; RGM of Georgia, Ltd.; USALCO, LLC; Delta Chemical Corporation, Kemira Chemicals, Inc.; Hawkins, Inc.; Southern Ionics, Inc.; and John Doe Nos. 1 – 50 jointly and severally (collectively hereinafter "Defendants").

In support of its claims, Plaintiff Richmond alleges as follows:

## I.   **INTRODUCTION**

1.      This is an action under the Sherman Antitrust Act and the Clayton Antitrust Act, and the laws of Commonwealth of Virginia, for compensatory damages, treble damages, injunctive relief, and other relief, including but not limited to an award of attorneys' fees and expenses, against Defendants, jointly and severally, for conspiring to suppress and eliminate competition in the sale and marketing of aluminum sulfate ("Alum") by agreeing to rig bids and allocate customers for, and to fix, stabilize, inflate, and maintain the price of Alum sold to

companies and municipal authorities in the United States from January 1, 1997 through at least February 2011 (the "Conspiracy Period").  Defendants' actions caused municipalities across the United States to overpay by many millions of dollars for the Alum they needed to make their communities' water safe to drink, thereby harming shareholders and taxpayers alike.  Plaintiff Richmond, which has paid millions of dollars to purchase Alum, seeks to recover damages it suffered from the initiation of the conspiracy until the cessation of the anticompetitive effects resulting therefrom (the "Injury Period").[1]

2.      Defendant companies are manufacturers and distributors of Alum used by municipalities to treat potable water and/or wastewater, by pulp and paper manufacturers as part of their manufacturing process, and in lake treatment to reduce phosphorous levels contributing to degraded water quality.  The individual defendants were executives at these companies.

3.      During the Conspiracy Period, Defendants conspired, combined, and contracted to fix, raise, maintain, and stabilize the prices at which Alum would be sold.  As more fully detailed *infra*, Frank A. Reichl, a former senior executive at Defendant General Chemical Corporation, and Defendant GEO Specialty Chemicals, Inc., each already have agreed to plead guilty to participating in the conspiracy.  General Chemical Corporation has been granted conditional amnesty by the United States Department of Justice ("Department of Justice") for its conduct relating to the Alum conspiracy, which conditional amnesty, as described further below, required that General Chemical Corporation admit to engaging in criminal-anticompetitive conduct with its competitors.  Two other senior executives of Defendants General Chemical Corporation and

---

[1]     The conspiracy continued to cause anticompetitive harm even after the Conspiracy Period ended, because, among other reasons, many of the Alum supply contracts executed during the Conspiracy Period remained in effect until they expired according to their terms or were renegotiated, and the effects of the conspiracy on price did not reach a nonconspiratorial level prior to the end of the Conspiracy Period.

GEO Specialty Chemicals – Vincent J. Opalewski and Brian C. Steppig, respectively – were indicted by the United Stated on February 17, 2016, for participating in the conspiracy.  Upon information and belief, Opalewski, as Reichl's superior at General Chemical Corporation during at least a portion of the Conspiracy Period, authorized, conducted, oversaw, participated in, and/or was aware of the illegal conduct to which Reichl has pleaded guilty.  Upon information and belief, Steppig, authorized, conducted, oversaw, participated in, and/or was aware of the illegal conduct to which GEO Specialty Chemicals, Inc. has pleaded guilty.

4.      In order to facilitate the conspiracy, Defendants engaged in regular communications throughout the Conspiracy Period, to discuss customer allocation and prices for Alum.  Upon information and belief, evidence in the form of phone records and emails between top executives at the Defendant companies and their co-conspirators demonstrate that they furthered the conspiracy by (a) meeting or otherwise communicating to discuss their respective Alum businesses, including the prices quoted or bid to their customers, (b) agreeing to allocate customers and "stay away"  from each other's historical customers, (c) agreeing to rig bids by submitting intentionally high "throw-away" bids to a particular customer to ensure that their co-conspirator, the existing seller to that customer, would continue to "win" that customer's business (or to help the co-conspirator to raise the prices paid by that customer), and (d) withdrew a winning bid or price quote in cases where a bid was inadvertently submitted.

5.      As a result of Defendants' unlawful conduct, Plaintiff Richmond paid more for Alum than it would have if a competitive market had determined Alum prices.

6.      Plaintiff Richmond sustained damages as a result of Defendants' and co-conspirators' anticompetitive conduct as alleged herein.

## II.    <u>JURISDICTION AND VENUE</u>

7.      This Court had federal question jurisdiction over the subject matter of this action pursuant to 15 U.S.C. § 4 (Sherman Antitrust Act jurisdiction), 15 U.S.C. §§ 15 & 26 (Clayton Antitrust Act jurisdiction), 28 U.S.C. § 1331 (general federal question jurisdiction), & 28 U.S.C. § 1337 (antitrust jurisdiction).  The Court has jurisdiction over Plaintiff Richmond's state law claims pursuant to 28 U.S.C. § 1367 (pendent jurisdiction).

8.      Venue is proper in this District pursuant to 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b), (c), and (d), because during the Conspiracy Period, one or more of the Defendants resided in, transacted business in, was found in, or had agents in this District.

9.      This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant:  (a) transacted business in this District; (b) participated in the manufacturing and/or distribution of Alum in this District; (c) had substantial aggregate contacts with this District; and (d) engaged in an unlawful conspiracy with regard to Alum described herein that was directed at, and had the effect of causing injury to, persons and entities residing in, located in, and/or doing business in this District.

### III.   PARTIES

**A.   PLAINTIFF**

10.     Plaintiff, the City of Richmond, is a municipal corporation chartered by the State

of Virginia.  It has its principal place of business at 900 E. Broad Street, Richmond, Virginia

23219.  During the Injury Period, Plaintiff Richmond directly purchased Alum from one or more

of the Defendants, or their co-conspirators, and has suffered antitrust injury as a result of

Defendants' illegal conduct as alleged in this Complaint.

**B.   DEFENDANTS**

11.     Defendant Frank A. Reichl ("Reichl") is a citizen of the State of New Jersey,

residing in Flanders, New Jersey.  During the Conspiracy Period, Reichl was employed by

General Chemical Corporation and General Chemical Performance Products, LLC.  Prior to July

2005, Reichl was the General Manager of Water Chemicals.  From approximately 2006 through

2010, Reichl was the Vice President of Sales and Marketing.  As both General Manager and Vice

President, Reichl oversaw the sale and marketing of water treatment chemicals, including Alum,

and was responsible for pricing and strategy, analyzing proposals, determining prices, approving

bid and price proposals, and supervising other sales and marketing employees.[2]  On October 27,

2015, Reichl pleaded guilty for his role in the unlawful conspiracy with regard to Alum

described herein.

12.     Defendant Vincent J. Opalewski ("Opalewski") is a citizen of the State of New

Jersey, residing in the Rockaway, New Jersey area.  Upon information and belief, Plaintiff

---

[2]      Upon information and belief, between January 1997 and July 2010, Reichl held positions
in which he was responsible for the sale and marketing of water treatment chemicals,
including Alum, except for the period from approximately July 2005 to approximately
December 2006, when he was employed in other roles that were not engaged in the sale
and marketing of water treatment chemicals.

Richmond alleges that at all relevant times, Opalewski actively conspired with Defendants and co-conspirators in their unlawful conspiracy.  From approximately 2005 through 2011, Opalewski held high-level executive positions at Defendant General Chemical in which he was responsible for the sale and marketing of water treatment chemicals, including Alum.  Opalewski was the Vice President of Sales and Marketing from approximately 2005 to 2006, Vice President and General Manager from approximately 2006 to 2009, and President from approximately 2009 to 2011.  On February 17, 2016, Opalewski was indicted by the United States for his role in the unlawful Alum conspiracy described herein.

13.     Defendant Brian C. Steppig ("Steppig") is a citizen of the State of Arkansas, residing in the Little Rock, Arkansas area.  Upon information and belief, at all relevant times, Steppig actively conspired with Defendants and co-conspirators in their unlawful conspiracy. From approximately 1997 through 2011, Steppig held high-level executive positions at Defendant GEO Specialty Chemicals in which he was responsible for the sale and marketing of water treatment chemicals, including Alum.  Steppig was a National Sales Manager for pulp and paper water treatment chemicals from approximately 1997 to August 2006, and Director of Sales and Marketing for water treatment chemicals from approximately August 2006 to the present. On February 17, 2016, Steppig was indicted by the United States for his role in the unlawful Alum conspiracy described herein.

14.     Defendant Alex Avraamides ("Avraamides") resides in Maywood, New Jersey. From 1994 through 2011, Avraamides held high-level executive positions at General Chemical and GEO Specialty Chemicals, Inc., including Director of Sales and Marketing at General Chemical from 1994 to 2005, Senior Vice President and General Manager of GEO Specialty Chemicals, Inc. from 2005 to 2010, and Vice President of Sales and Marketing at General

Chemical from 2010 to 2011.  In these positions, Avraamides's responsibilities included directing the sale and marketing of Alum.  During the Conspiracy Period, Avraamides conspired with Defendants and co-conspirators in this unlawful conspiracy.

15.     Defendant Amita Gupta ("Gupta") is a resident of the United States.  From April 2008 until September 2012, Gupta was the Director of Sales and Marketing for Water Treatment Chemicals for General Chemical.  In this position, Gupta's responsibilities included directing the sale and marketing of Alum.  During the Conspiracy Period, Gupta conspired with Defendants and co-conspirators in this unlawful conspiracy.

16.     Defendant General Chemical Corporation was a corporation existing under the laws of Delaware, with its principal place of business at 90 East Halsey Road, Parsippany, New Jersey, 07054.  General Chemical Corporation maintained Alum manufacturing and distribution facilities throughout the United States and was a leading manufacturer and supplier of water treatment chemicals, including Alum.  During the Injury Period, directly or through its subsidiaries and affiliates, General Chemical Corporation sold Alum throughout the United States, and, in particular, to Richmond.

17.     Defendant General Chemical Performance Products, LLC, was a limited liability company existing under the laws of Delaware, with its principal place of business at 90 East Halsey Road, Parsippany, New Jersey, 07054.  During the Injury Period, directly or through its subsidiaries and affiliates, General Chemical Performance Products, LLC sold Alum throughout the United States and, in particular, to Richmond.  At all relevant times, General Chemical Performance Products, LLC was a wholly-owned subsidiary of General Chemical Corporation.

18.     Defendant General Chemical LLC was a limited liability company existing under the laws of Delaware, with its principal place of business at 90 East Halsey Road, Parsippany,

New Jersey, 07054.  At all relevant times, General Chemical LLC was a wholly-owned subsidiary of General Chemical Performance Products, LLC.

19.     Defendants General Chemical Corporation, General Chemical Performance Products, LLC, and General Chemical LLC, are referred to collectively herein as "General Chemical."

20.     As the legal successors-in-interest to General Chemical, Defendants Chemtrade Logistics Income Fund, Chemtrade Logistics, Inc., Chemtrade Chemicals Corporation, Chemtrade Chemicals US, LLC, and Chemtrade Solutions, LLC assumed General Chemical's liability for General Chemical's participation in the unlawful Alum conspiracy described herein.

21.     Defendant GenTek, Inc. ("GenTek") is a corporation existing under the laws of Delaware, with its principal place of business at 90 East Hasley Road , Parsippany, New Jersey, 07054.  General Chemical was a wholly-owned and controlled subsidiary of GenTek from approximately 1999 to October 2009.  Upon information and belief, GenTek, as General Chemical's parent company, was aware of, authorized, and acquiesced in General Chemical's role and participation in the unlawful conspiracy described herein.  During the Injury Period, directly or through its subsidiaries and affiliates, GenTek sold Alum throughout the United States.

22.     In 2002, GenTek, General Chemical, and their then-existing related corporate entities filed a voluntary Chapter 11 petition in the United States Bankruptcy Court for the District of Delaware, including bankruptcy filings on behalf of its subsidiaries, including General Chemical.  GenTek and General Chemical were active participants in the conspiracy before and at the time they filed for bankruptcy.  Accordingly, GenTek and General Chemical were aware of the conspiracy at the time they filed for bankruptcy.  Notwithstanding their knowledge and

participation in the conspiracy, they did not disclose any claim arising out of the unlawful conspiracy as a liability on their applicable bankruptcy schedules.  GenTek and General Chemical continued to participate in the conspiracy during the time their bankruptcy petition was pending.  Effective October 7, 2003, GenTek and General Chemical emerged from bankruptcy under a plan of reorganization.  After emerging from bankruptcy, GenTek and General Chemical continued to participate in the conspiracy and reaffirmed their participation through specific post-bankruptcy actions taken by GenTek and General Chemical in furtherance of the conspiracy, as alleged below.  GenTek and General Chemical also reaffirmed its participation in the conspiracy by continuing to engage in the conduct described herein with respect to Alum.

23.     In October 2009, non-party American Securities, LLC ("American Securities"), a private equity firm, acquired GenTek.

24.     Defendant Chemtrade Logistics Income Fund is a limited purpose trust established in 2001 under the laws of the Province of Ontario, and has its principal place of business in Toronto, Canada.  Chemtrade Logistics Income Fund's operating subsidiaries provide industrial chemicals and services to customers throughout Canada, the United States, and Europe.  Chemtrade Logistics Income Fund's Water Solutions and Specialty Chemicals segment manufactures and markets a variety of inorganic coagulants for water treatment applications, including Alum.

25.     In January 2014, Defendant Chemtrade Logistics Income Fund acquired General Chemical for $860 million from American Securities.

26.     Defendant Chemtrade Logistics, Inc. is a Canadian corporation incorporated under the laws of the Province of Ontario, and has its principal place of business in Toronto, Canada.  Chemtrade Logistics, Inc. is a subsidiary of Chemtrade Logistics Income Fund.

27.     Defendant Chemtrade Chemicals Corporation is a Delaware corporation with its principal place of business at 90 East Hasley Road, Parsippany, New Jersey, 07054.  Chemtrade Chemicals Corporation is a wholly-owned subsidiary of Defendant Chemtrade Logistics, Inc. During the Injury Period, Chemtrade Chemicals Corporation sold Alum directly to purchasers in the United States.

28.     Defendant Chemtrade Chemicals US, LLC, is a Delaware limited liability company with its principal place of business at 90 East Hasley Road, Parsippany, New Jersey, 07054.  Chemtrade Chemicals US, LLC is a wholly-owned subsidiary of Defendant Chemtrade Logistics, Inc.  During the Injury Period, Chemtrade Chemicals US, LLC sold Alum directly to purchasers in the United States.

29.     Defendant Chemtrade Solutions, LLC is a Delaware corporation with its principal place of business at 90 East Hasley Road, Parsippany, New Jersey, 07054.  Chemtrade Solutions LLC is a wholly-owned subsidiary of Defendant Chemtrade Chemicals Corporation.

30.     General Chemical, under the ownership of Chemtrade Logistics, Inc., operates as Chemtrade Chemicals Corporation and Chemtrade Chemicals US, LLC.

31.     Defendants Chemtrade Logistics Income Fund, Chemtrade Logistics, Inc., Chemtrade Chemicals Corporation, Chemtrade Chemicals US, LLC, and Chemtrade Solutions, LLC are collectively referred to herein as "Chemtrade" unless otherwise indicated.  Chemtrade manufactures and sells water treatment chemicals, including Alum, throughout the United States. Chemtrade is the legal successor-in-interest to General Chemical.  As the legal successor-in-interest to General Chemical, Chemtrade assumed General Chemical's liability for General Chemical's participation in the unlawful Alum conspiracy described herein.

32.     Defendant GEO Specialty Chemicals, Inc. ("GEO") is an Ohio corporation with its principal place of business at 340 Mathers Road, Ambler, Pennsylvania, 19002.  GEO manufactures, markets, and distributes specialty chemicals, including Alum, for customers throughout the United States and internationally.  GEO has water treatment chemical production facilities in Alabama, Arkansas, Georgia, Louisiana, Maryland, Mississippi, North Carolina, South Carolina, Tennessee, and Texas.  During the Injury Period, directly or through its subsidiaries and affiliates, GEO sold Alum throughout the United States.  On June 16, 2016, GEO pleaded guilty for its role in the unlawful Alum conspiracy described herein.  Upon information and belief, at all relevant times, GEO was aware of, authorized, and acquiesced in Defendant Steppig's participation in the unlawful Alum conspiracy described herein.

33.     On or about March 18, 2004, GEO filed a voluntary Chapter 11 petition in the United States Bankruptcy Court for the District of New Jersey.  GEO was an active participant in the conspiracy before and at the time it filed for bankruptcy.  Accordingly, GEO was aware of the conspiracy at the time it filed for bankruptcy.  Notwithstanding its knowledge and participation in the conspiracy, GEO did not disclose any claim arising out of the unlawful conspiracy as a liability on the applicable bankruptcy schedule.  GEO continued to participate in the conspiracy during the time its bankruptcy petition was pending.  Effective December 20, 2004, GEO emerged from bankruptcy under a plan of reorganization.  After emerging from bankruptcy, GEO continued to participate in the conspiracy and reaffirmed its participation through specific post-discharge actions taken by GEO in furtherance of the conspiracy, as alleged below.  GEO also reaffirmed its participation in the conspiracy in part by continuing to engage in the conduct described herein with respect to Alum.  GEO participated in the

conspiracy alleged herein throughout the Conspiracy Period through the actions of GEO's senior executives.

34.     Defendant C & S Chemicals, Inc. ("C & S Chemicals") is a Delaware corporation with its principal place of business at 4180 Providence Road, Marietta, Georgia, 30062.  C & S Chemicals specializes in the production of Alum and sodium aluminate, and currently operates six manufacturing facilities located in Florida, Georgia, South Carolina, Illinois, and Minnesota. During the Injury Period, directly or through its subsidiaries and affiliates, C & S Chemicals sold Alum throughout the United States.

35.     Defendant C & S Chemicals (of Georgia), Inc. ("C & S of Georgia") is a Georgia corporation with its principal place of business at 4180 Providence Road, Marietta, Georgia, 30062.  C & S of Georgia is an affiliate of C & S Chemicals.  During the Injury Period, directly or through its subsidiaries and affiliates, C & S of Georgia sold Alum throughout the United States.

36.     Defendants C & S Chemicals and C & S of Georgia are collectively referred to herein as "C & S" unless otherwise indicated.

37.     Defendant RGM Chemical, LLC ("RGM Chemical") is a Georgia limited liability company with its principal place of business at 4180 Providence Road, Marietta, Georgia, 30062. During the Injury Period, directly or through its subsidiaries and affiliates, RGM Chemical sold Alum throughout the United States.

38.     Defendant RGM of Georgia, Ltd. ("RGM of Georgia") is a Georgia corporation with its principal place of business at 4180 Providence Road, Marietta, Georgia, 30062.  RGM of Georgia is an affiliate of RGM Chemical.  During the Injury Period, RGM of Georgia sold Alum throughout the United States.

39.     Defendants RGM Chemical and RGM of Georgia are collectively referred to herein as "RGM" unless otherwise indicated.

40.     Defendant USALCO, LLC ("USALCO") is a Maryland corporation with its principal place of business at 2601 Cannery Avenue, Baltimore, Maryland, 21226.  USALCO manufactures and distributes aluminum-based chemical products, including Alum, throughout North America.  USALCO has manufacturing facilities in Indiana, Louisiana, Maryland, and Ohio.  During the Injury Period, directly and/or through its subsidiaries and affiliates, USALCO sold Alum throughout the United States.

41.     Defendant Delta Chemical Corporation ("Delta Chemical") was a Maryland corporation with its principal place of business at 120 East Baltimore Street, Suite 2100, Baltimore, Maryland, 21202.   In November 2011, USALCO acquired Delta Chemical.  From the beginning of the Conspiracy Period to the date it merged into USALCO in November 2011, Delta Chemical was an active participant in the conspiracy.  USALCO became the successor in interest to all of Delta Chemical's liabilities when it acquired Delta Chemical in November 2011. During the Injury Period, Delta Chemical, as to which USALCO is the successor in interest, sold Alum throughout the United States.  Plaintiff sues USALCO both for its own illegal conduct and, as a successor in interest to Delta Chemical, for Delta Chemical's illegal conduct.

42.     Defendant Kemira Chemicals, Inc. ("Kemira") is a Georgia corporation with its principal place of business at 1000 Parkwood Circle, Suite 500, Atlanta, Georgia, 30339. Kemira is a subsidiary of Kemira Oyj, a Finnish company with its principal place of business in Helsinki, Finland.  Kemira is the successor company to Kemiron Companies, Inc. ("Kemiron").[3]

---

[3]     Kemiron was a large manufacturer of aluminum-based chemicals, including Alum, headquartered in Barstow, Florida.  Kemira held a large ownership interest in Kemiron

Kemira manufactures, formulates, and supplies specialty and process chemicals, including Alum, for water treatment and industrial applications in the United States and internationally.  Kemira has water treatment chemical manufacturing facilities in Alabama, California, Florida, Georgia, Kansas, Missouri, North Carolina, Ohio, Texas, and Washington.  During the Injury Period, directly or through its subsidiaries and affiliates, Kemira sold Alum throughout the United States.

43.     Defendant Hawkins, Inc. ("Hawkins") is a publicly-held Minnesota corporation with its principal place of business at 2381 Rosegate, Roseville, Minnesota.  Hawkins blends, manufactures, and distributes various chemical products.  Hawkins operates in two segments, industrial and water treatment.  The water treatment segment provides chemicals, equipment, and solutions for potable water, municipal and industrial wastewater, industrial process water, and non-residential swimming pool water.  Hawkins has water treatment chemical manufacturing facilities in Arkansas, Florida, Illinois, Indiana, Iowa, Kansas, Kentucky, Minnesota, Missouri, Montana, Nebraska, North Dakota, South Dakota, Tennessee, and Wisconsin.  During the Injury Period, directly or through its subsidiaries and affiliates, Hawkins sold Alum throughout the United States.

44.     Defendant Southern Ionics, Inc. ("Southern Ionics") is a Mississippi corporation with its principal place of business located at 1250 Neosho Ave., Baton Rouge, Louisiana. Southern Ionics manufactures and sells water treatment chemicals, including Alum.

45.     Defendants John Doe Nos. 1 – 50 are other entities or individuals whose identities are currently unknown to Richmond.  John Doe Nos. 1 – 50 conspired to suppress and eliminate competition in the sale and marketing of Alum by agreeing to rig bids and allocate customers for,

---

during the first part of the Conspiracy Period, and eventually purchased the remainder of Kemiron in approximately May 2005.

and to fix, stabilize, increase, and maintain the price of, Alum sold in the United States during the Injury Period.

46.     The acts alleged herein to have been committed by Defendants were authorized, ordered, or performed by Defendants' directors, officers, managers, employees, agents, and/or representatives in the course of their employment and while actively engaged in the management of Defendants' business.

## IV.    UNIDENTIFIED CO-CONSPIRATORS

47.     Other individuals and entities, not named as Defendants in this Complaint, participated as co-conspirators with Defendants in the violations alleged herein, and aided and abetted Defendants and performed acts and made statements, all in furtherance of the conspiracy.

48.     The true names and capacities of these unidentified co-conspirators, whether individual, corporate, associate, or representative, are unknown to Plaintiff Richmond at this time.  Plaintiff Richmond may amend this Complaint, as necessary, to allege the true names and capacities of additional co-conspirators as their identities become known through discovery or additional criminal indictments.

49.     At all relevant times, other individuals and entities referred to herein as "unidentified co-conspirators," the identities of which are presently unknown, conspired with Defendants in the unlawful conspiracy described herein.

50.     The acts alleged herein that were performed by each of the unidentified co-conspirators were fully authorized by each of these unidentified co-conspirators, or were ordered, or committed by duly authorized officers, managers, agents, employees, or representatives of each unidentified co-conspirator, while actively engaged in the management, direction, or control of its affairs.

## V.     INTERSTATE TRADE AND COMMERCE

51.     Throughout the Injury Period, there was a continuous and uninterrupted flow of interstate trade and commerce throughout the United States in the sale of Alum by Defendants to their customers located throughout the United States.

52.     Throughout the Injury Period, Defendants' conspiracy and agreement to fix, raise, inflate, maintain and/or stabilize prices of Alum in the United States took place within and substantially affected the flow of interstate commerce and had a direct, substantial, and reasonably foreseeable effect upon commerce throughout the United States.

## VI.     RELEVANT MARKET

53.     The relevant product market alleged herein is the market for Alum.

54.     The relevant geographic market is the United States, or, in the alternative, is the market for Alum sold in the Eastern United States.  Local and/or regional geographic sub-markets may exist due to transportation costs associated with the sale and delivery of Alum.

## VII.     ALLEGATIONS OF FACT COMMON TO ALL CLAIMS

### A.     ALUM INDUSTRY BACKGROUND

55.     According to 2015 market research reports, total global sales of water treatment chemicals, including Alum, are expected to amount to approximately $25 billion yearly as of 2020.  North America accounts for approximately 29% of the global purchases of all water treatment chemicals.

56.     Alum is a versatile chemical that can function as a coagulant, flocculant, precipitant, and emulsion breaker.  Alum removes turbidity, suspended solids, and total organic carbon, and reduces biochemical oxygen demand.  Alum is used in both municipal and industrial applications.

57.     Alum is sold in both dry and liquid forms.

58.     Alum is the salt of sulfuric acid and aluminum hydroxide known by its chemical name $AL_2(SO_4)_3$.  In municipal water treatment and paper making applications, Alum is used as a source of $Al_3+$, which is a highly charged ionic "species" that attracts negative particles (such as those that discolor raw water supplies), reacts with negative particles, and then precipitates those particles out of the solution as ionic solids.

59.     Much of the Alum produced today is used for water and wastewater treatment for clarification and phosphorous removal, and as an agent in the purification of drinking water.  In water purification, Alum causes impurities to coagulate into larger particles or clump together before settling to the bottom of the container, allowing them to be filtered out more easily.  This process is called coagulation or flocculation.

60.     One of the reasons Alum has become widely accepted as a water treatment chemical is because of its chemical efficacy and stability.  Compared to its alternatives, such as anhydrous or aqueous ammonia, which are hazardous and require pressurized storage tanks and special handling and safety procedures, the storage and handling of Alum is significantly safer and easier.

61.     Alum is typically sold by the ton and transported to customers by rail or truck.

62.     One factor Alum suppliers consider in deciding whether to bid or quote on a contract is whether providing the product to the specific buyer is "freight logical," that is, whether the supplier can make a profit on the contract taking into account the distance from the supplier's plant to the customer and the corresponding cost of freight.

63.     Municipal authorities, such as Richmond, routinely purchase Alum to treat potable water and/or wastewater.  Municipal authorities typically acquire Alum through a publicly-advertised bidding process, as Richmond did here, and municipal contracts for Alum are

often one year in duration with options to renew for a certain period of time.  The awards of such municipal contracts are typically made public.

64.    Sales of Alum by Defendants and their co-conspirators in the United States during the Injury Period totaled in the billions of dollars.

## B.    THE ALUM MARKET IN THE UNITED STATES IS SUSCEPTIBLE TO COLLUSION

65.    Publicly available data on the Alum market in the United States demonstrate that it is susceptible to cartelization by the Defendants and their co-conspirators.  Factors that made the Alum market susceptible to collusion during the Conspiracy Period include:  (1) a standardized product for which competition was principally on the basis of price; (2) stable or declining input costs for much of the Conspiracy Period; (3) weak demand in a mature market; (4) the lack of available economic substitutes; (5) high barriers to entry; (6) industry concentration and consolidation; (7) price increase announcements following opportunities to collude; and (8) a history of collusive conduct in the water treatment chemicals industry.

### i.    Alum Is a Commodity Product With a High Degree of Interchangeability

66.    Typically, when a product is characterized as a commodity, market participants compete principally on the basis of price, rather than attributes such as product quality.  When competition occurs principally on the basis of price, it is easier to implement and monitor a cartel because price is more often objectively measureable and observable than non-price factors.

67.    The bidding process by which suppliers are supposed to compete to provide Alum to a municipality demonstrates that Alum is a commodity product that is interchangeable across suppliers, and competition in the market is driven principally by price.

68.     Alum is a commodity product with specific specifications for iron content, specific gravity, density, and color, as shown below.[4]

## Typical Properties

| Property | UM | Alum |
|---|---|---|
| Al2O3 | Wt.% | 8.28 |
| Fe2O3 | ppm | 50 max |
| Specific Gravity@ 60°F | – | 1.33 |
| Baume @ 60°F | – | 35.77 |
| Density | – | 11.08 |
| Color | Lbs/Gal | Clear to Amber or Light Green |
| Dry 17% Alum | Wt.% | 48.20 |

69.     A 2006 report noted the increased commoditization of Alum and other chemicals in North America.  A 2009 report by the Water Research Foundation stated, "Alum is a commodity chemical."  A 2012 analyst report described inorganic coagulants such as Alum as "commodity chemicals that are relatively easy to manufacture."  A 2015 analyst report noted that water management chemicals are split into two major categories:  specialty chemicals and "[c]ommodity chemicals such as [A]lum."

**ii.     Input Costs for Alum Were Stable or Declining for Much of the Conspiracy Period**

70.     Rising input costs for Alum cannot explain the significant price increases Defendants imposed on their customers during the Conspiracy Period.

71.     Alum is manufactured by combining sulfuric acid with aluminum trihydrate (also known as alumina or ATH).  Aluminum trihydrate is purified from bauxite by dissolving the

---

[4]     Chart from http://www.usalco.com/products/aluminum-sulfate-solution-alum.

bauxite ore in strong caustic soda to form sodium aluminate, which is then precipitated by neutralization to form aluminum trihydrate.

72.     As shown by the graph below, bauxite (the raw material for alumina) prices fell markedly during the period from 1991 to 2003, declining almost 50%.  From 2003 to 2007, bauxite prices rose around $6 per ton, but leveled off and declined slightly by the end of 2007.[5] From 2008 to 2010, bauxite prices declined a further $3-4 per ton.



73.     According to a 2014 article by Forbes, alumina pricing is traditionally about 12-14% of the price quoted for aluminum on the London Metal Exchange.  Aluminum prices were relatively stable for much of the Conspiracy Period from 1997 to early 2006, with a large increase in 2007 and 2008, and then a rapid crash in prices in late 2008 and early 2009.[6]

---

[5]     Graph available at http://www.australianbauxite.com.au/site_folders/232/images/ Metallurgical%20Bauxite/Graph2.jpg.

[6]     Graph available at http://www.morningstar.com.au/s/images/6718-AWC-1.gif.



74.     Sulfuric acid costs were also relatively stable from 1997 to 2007.  A brief spike in sulfuric acid prices in 2008 was followed by a crash in prices by early 2009 and historically low prices for the remainder of 2009 and 2010.

75.     During the early part of the Conspiracy Period from 1997 to 2004, Alum prices experienced significant price increases.  During the period from 1998 to 2004, there were numerous parallel price increases by Defendants, including, but not limited to, the following announcements publicly reported by the chemical industry publication *ICIS*:

  a.  General Chemical and GEO announced identical Alum price increases of $15 per ton on August 10 and August 31, 1998.

  b.  General Chemical and GEO announced identical Alum price increases of $15 per ton on October 4 and October 18, 1998.

  c.  Southern Ionics, GEO, and General Chemical announced Alum price increases of $8-9 per ton around December 2000.

  d.  Kemiron, General Chemical, and GEO announced identical Alum price increases of $10 per ton between November 21 and December 12, 2003.

  e. USALCO and General Chemical both announced Alum price increases effective December 1, 2004, which were subsequently reported by *ICIS* on December 3, 2004.

  76. The declining pricing of the primary input costs of Alum – alumina and sulfuric acid – necessarily cannot explain the rise in Alum prices from 1998 to 2004.  Instead, these price increases were the result of Defendants' illegal conspiracy to fix the price of and rig bids for Alum.

  77. A 2009 report by the Water Research Foundation analyzed a survey conducted about the rising costs of water treatment chemicals during the period between January 2008 and January 2009.  The survey was administered by the Association of Metropolitan Water Agencies, and forty-seven United States drinking water utilities responded.  Twenty-five of these utilities reported using Alum and incurring an average 53% price increase over the preceding year, with maximum price increases reaching as high as 168%.  Although raw material cost increases were cited as a major cause of these increases, as noted above, the report noted that the "boom" in commodities was over by mid-2008.

  78. In its publicly-filed 2009 Form 10-K, GenTek reported that price increases on products such as Alum contributed significantly to the profits GenTek earned on successful bids and RFP responses in the water treatment market:  "Sales into the water treatment market increased by $67 million driven by $59 million resulting from increases in selling prices . . . ."  GenTek's increased revenues in 2008 largely resulted from Defendants' conspiracy to increase the price of Alum in the United States.

     **iii.**      **Alum Experienced Weak Demand in a Mature Market During the Conspiracy Period**

79.     Static or declining demand makes the formation of a collusive arrangement more likely.  In a competitive market, when faced with static or declining demand conditions, firms often attempt to increase sales by taking market share from competitors at decreasing prices.  For this reason, firms faced with static or declining demand have greater incentive to collude to avoid price competition with competitors and protect against poor financial results and/or bankruptcy.

80.     Demand for Alum is driven by demand in end-use markets in which it is employed.  These markets include water treatment and the pulp and paper industry.  According to one 2004 article, "demand for [A]lum has slowed due to retraction and consolidation in the pulp and paper market, a major market for [A]lum."

81.     In its 2008 annual report, Kemira's parent company described demand as follows: "Only modest growth can be expected in the Municipal & Industrial segment's relevant market in Europe and North America, as water treatment infrastructure is already largely built and growth in demand is therefore restricted."

82.     One 2001 article described the Alum market as "very mature, with a projected annual growth rate of roughly 2 percent."  A 2004 *ICIS* article noted that Alum is a mature commodity market.  Similarly, a 2015 analyst report notes that the "technologies currently used in water treatment are mature."  Given this mature market, future sales of Alum will be determined by population growth.  In its 2013 annual report, Chemtrade noted that the "North American market for water treatment chemicals generally tracks GDP and population growth."

83.     In mature industries, firms' ability to increase sales is limited to population growth and replacement of existing products.  This means that slow growth rates often exist in mature industries because new distribution channels, which might raise sales, have typically been

exhausted.  Consequently, the only way for firms to capture additional market share in mature industries, where demand growth is slow or nonexistent, is by competing with each other on the basis of price.

84.     The lack of significant demand growth was further exacerbated by the presence of excess capacity.  Upon information and belief, none of Defendants' plants to manufacture water treatment chemicals were working at or near capacity during the Conspiracy Period.  Thus, the lack of capacity cannot explain Defendants' decisions not to compete for Alum business during the Conspiracy Period.  Absent an antitrust conspiracy, the presence of excess capacity, particularly for a commodity product, means that firms are incentivized to increase their sales by maintaining or even lowering prices, not increasing them.

### iv.        There Are No Apparent Economic Substitutes for Alum

85.     Economists regard products as economic substitutes for one another if a nominal change in price for one product results in increased demand for the other product.  The change in price necessary to cause consumers to switch to a substitute good is often considered to be around five percent.  The lack of available economic substitutes for a product facilitates collusion among producers, because customers are not reasonably able to avoid supra-competitive prices by switching to another product.

86.      Other chemicals are not economic substitutes for Alum at water treatment facilities because, *inter alia*, each chemical is dosed and applied differently at water treatment facilities.  Therefore, there are substantial infrastructure and other costs associated with switching the treatment chemical used by any particular water treatment facility.

v.        **There Are Significant Barriers to Entry in the Alum Market**

87.    Supra-competitive pricing in a market typically attracts additional competitors attempting to avail themselves of the inflated prices.  Significant barriers to entry, however, make new competition more difficult and facilitate the formation and maintenance of a cartel.

88.    There were significant barriers to entry which have prevented potential competitors from effectively competing in the Alum market in the United States during the Injury Period.  An August 2009 article in *WaterWorld* noted that "[t]he North American water treatment chemicals market is mature with high entry barriers."  These barriers include production, manufacturing, and transportation costs, as well as satisfaction of regulatory requirements.  High barriers to entry also exist because only a competitor with specialized technical knowledge, the capital necessary to build costly manufacturing facilities, and access to distribution channels could have competed in this market.

89.    According to industry experts, the Alum market had no new entrants during the Conspiracy Period.  In 2003, Karla Doremus-Tranfield, General Chemical's Marketing Manager, noted that no new suppliers had entered the marketplace.  Since 2010, the only significant new entrant in the Alum industry is Affinity Chemical, LLC ("Affinity").  Affinity was formed in 2011 by Defendant Reichl, who pled guilty to participating in an unlawful conspiracy on October 27, 2015.

vi.       **The Alum Industry Is Highly Concentrated and Has Experienced Heavy Consolidation**

90.    The Alum industry is dominated by a small number of companies.

91.    The Alum industry experienced heavy consolidation in the years leading up to and including 1997.

92.     GEO, in particular, made several acquisitions between 1993 and 1997.  In June 1993, GEO acquired the Gulf Coast Alum business and customer list of Rhone Poulenc, a large French chemical company that exited the United States market after the sale.  In July 1994, GEO acquired the aluminum chemicals business of Courtney Industries.  In December 1996, GEO acquired the Alum business of Cytec Industries, Inc. ("Cytec"), which included seven Alum plants in the Southeastern U.S.  GEO's purchase of Cytec made GEO a major national supplier of Alum immediately before the start of the Conspiracy Period.  In March 1997, GEO announced that it was acquiring the United States and Canadian paper chemicals business of Henkel Corporation.  In September 1998, Denny Grandle, the Vice President and General Manager of GEO's Aluminum Products Division, commented that "[t]he consolidation has helped capacity," noting that GEO had recently closed an Alum plant located in Spring Hill, Louisiana.

93.     In June 1997, General Chemical purchased Peridot Holdings, Inc. ("Peridot"), a manufacturer and supplier of various water treatment chemicals, including Alum.  In September 2006, General Chemical acquired GAC MidAmerica, Inc., a producer of Alum and bleach.  In February 2007, General Chemical acquired Chalum, Inc., which produced Alum for the greater Phoenix area.  In December 2007, General Chemical acquired Bay Chemical and Supply Company, a producer and distributor of Alum and other water treatment chemicals in south Texas.  In early 2011, General Chemical acquired certain Alum-related assets of Alchem, including Alchem's customer list.

94.     General Chemical and GEO's acquisitions immediately before the start of the Conspiracy Period left them with the largest Alum market shares by 1998.  According to an October 1999 *ICIS* article, "[p]rior to 1998, the [A]lum industry went through a period of stiff

competition that triggered a downturn in its major markets." According to the same article, however, Alum prices started shifting upwards around 1998.

95.     The acquisitions continued throughout the Conspiracy Period. In August 2003, Kemira expanded its holdings in Kemiron from 15% to 60%. In 2004, Kemiron acquired Eaglebrook International Group, Ltd. ("Eaglebrook"), a leading manufacturer and distributor of water treatment chemicals located in Matteson, Illinois. In May 2005, Kemira strengthened its position in North America by purchasing the remaining 40% of Kemiron's shares. In November 2011, USALCO acquired 100% of Delta Chemical Corporation, a water treatment chemical company based in Baltimore, Maryland.

96.     The concentration in the Alum industry was further exacerbated by agreements among Defendants to distribute one another's products. For instance, Hawkins has agreements with Kemira to distribute Alum, even though Hawkins itself manufactures Alum. Such swaps, trades, and selling and distribution agreements among competitors in a consolidated market facilitate collusion among ostensible competitors.

### vii.        Opportunities To Collude Facilitated Defendants' Conspiracy

97.     As noted in Reichl's indictment, there were countless opportunities for Defendants to communicate and conspire with each other and their co-conspirators. Defendants and their co-conspirators regularly met and discussed each other's business, entered into "no compete" agreements, allocated customers, and submitted artificially-inflated bids.

98.     Notably, representatives from General Chemical, including Reichl, frequently attended national and local industry conferences where they had the opportunity to meet with Defendants and their co-conspirators to collude.

99.     The American Water Works Association ("AWWA") also provides numerous opportunities and the means for Defendants to collude. In addition to national level meetings,

trainings, and networking events, there are over forty state and regional AWWA sections that hold their own meetings, training, and networking events.  For instance, the Southwest Section of the AWWA includes Alum producers Hawkins, Chemtrade, and Kemira.  Other Defendants participate in other regional AWWA sections.

100.    The American Chemistry Council ("ACC") is America's oldest trade association of its kind and includes companies engaged in the business of chemistry.  Upon information and belief, Defendants attended ACC's regular meetings and conferences, including executives from Chemtrade, GenTek, and Kemira.

101.    Reichl had the opportunity to meet and collude with other Alum manufacturers and suppliers for many years as a frequent participant at conferences conducted by, among others, the Arkansas Water Works & Water Environment Association, the Southwest Section of the American Water Works Association, and the Georgia Association of Water Professionals.  Reichl attended such conferences with representatives from many competitors..

102.    Defendants' attendance at industry conferences and trade associations facilitated their coordinated price increase announcements.  For instance, on December 3, 2004, *ICIS*, which purports to be "the world's largest petrochemical market information provider," published an article titled "Aluminum Sulfate Prices Rise with Demand and Costs."  Through this publication, Rich Fedison, Director of Sales and Marketing for General Chemical, signaled to the market that demand for Alum was stable and beginning to strengthen.  Fedison stated:  "The pulp and paper sector is finally beginning to recover after several years of poor performance as sustainable price increases and the recovering global economy are driving margin improvement.  On the municipal water side, tightening federal regulations on total organic compounds and disinfection byproducts are contributing favorably to the demand for inorganic coagulants."

Significantly, Fedison stated, "*[a]ll announced price increases for aluminum based inorganic coagulants are continuing to hold in all end-use markets*."  (Emphasis added).  This statement was a signal to Defendants and other Alum suppliers, providing a pretext for maintaining the artificially-inflated price level for Alum.

103.    Contemporaneously, Defendant General Chemical raised its list prices for commercial-grade Alum to $335 per ton on the East and Gulf Coasts and $370 on the West Coast.  Liquid material in tanks was $214 per ton, iron-free liquid material in tanks was $331 per ton, and dry iron-free Alum was $425 per ton.

104.    At the same time, USALCO raised its prices for Alum by $10 per ton, effective December 1, 2004, or as contracts permitted.

105.    Also at the same time, Kemiron raised its prices for all grades of polyaluminum chloride, aluminum chloride, aluminum chlorohydrate, sodium aluminate, and polyaluminum sulfate by $40 per ton, effective December 1, 2004.

106.    Sample public responses to bid requests by water districts during the Conspiracy Period illustrate what appear to be the types of sham "throw away" bids discussed in the Reichl indictment.  Examples include public documents published by the City of Columbia, South Carolina in June 2009, the City of Texarkana, Arkansas in August 2009, the Emerald Coast Utilities Authority (in Florida) in June 2010, and the City of Bellingham, Washington in 2006, all of which show disparities between the winning bids of General Chemical and those of GEO or other bidders that are consistent with the use of "throw away" bids.

### viii.    There Is a History of Collusive Conduct in the Water Treatment Chemicals Industry

107.    The water treatment chemicals industry has a history of collusion.

108.    In the 1980s, manufacturers of chlorine allegedly conspired to rig bids submitted to municipal water facilities, including by submitting non-competitive bids to municipalities for customers they had agreed to allocate to competitors in the Southeast.

109.    Similarly, two other chemicals used by water treatment facilities and paper companies – hydrogen peroxide and sodium chlorate – were the subject of alleged antitrust conspiracies.  First, from 1994 to 2005, producers of hydrogen peroxide settled claims that they unlawfully conspired to fix the price of hydrogen peroxide for tens of millions of dollars. Significantly, Defendant Kemira contributed $5 million to the hydrogen peroxide class action settlement, in addition to settling with a number of direct action litigants for undisclosed sums.[7] Second, in 2008, Kemira was fined EUR 10.15 million by the European Commission for anticompetitive conduct in its sodium chlorate business from 1994 to 2000.[8]

## C.    DEFENDANTS' MARKET ALLOCATION AND RELATED BID-RIGGING ACTIVITIES

110.    Prior to the Defendants' conspiracy, the market for the sale of Alum in the United States was marked by competition.  In the mid-1990s, for example, there was a "price war" between General Chemical and GEO in which each company bid aggressively for the accounts of the other company.

111.    As reflected in the GEO guilty plea and criminal indictments discussed herein, this era of competition and price wars ended in 1997 when Defendants entered into this antitrust conspiracy and agreed to "stay away" from each other's "historical" customers by not pursuing the business of those customers, and to engage in bid-rigging.

---

[7]    *In Re Hydrogen Peroxide Antitrust Litig.*, MDL Docket No. 1682, Dkt No. 474.

[8]    http://www.kemira.com/en/newsroom/whats-new/pages/1226984_20080611125213.aspx

112.    Upon information and belief, the conspiracy was hatched at this time when GEO's Avraamides, General Chemical's Reichl, and General Chemical's CEO Denny Grandle met and reached an agreement that they would no longer compete and instead collude to allocate customers.  Thereafter, others joined the conspiracy and abided by that agreement.  The purpose of Defendants' conspiracy was to keep "peace in the valley" in order to "not bring down market price" because Defendants agreed that it would be "better business for everyone to work together instead of competing and ruining the market price."

113.    Throughout the Conspiracy Period, Defendants engaged in a conspiracy to allocate customers among themselves.  They were in regular communication in order to facilitate the conspiracy.  These communications included discussions of specific bids and accounts.

**i.      Regular Inter-Defendant Meetings and Communications**

114.    Defendants' executives and employees regularly communicated with each other over the telephone, email, and during face-to-face meetings.  As admitted by the criminal pleas, Defendants discussed their overarching market allocation agreement, as well as specific customer accounts, including the handling of the bidding process as it related to customer accounts.

115.    For example, in April 2008, Gupta, the then-recently hired Director of Marketing for Alum at General Chemical, began the role of coordinating and enforcing the agreement among the Defendants.  On May 28, 2008, Gupta exchanged contact information via email with Steppig, the Director of Sales and Marketing at GEO who is currently under indictment for his role in the conspiracy.  Gupta promised to get "back to [him] with the other info we discussed," and later called Steppig on his mobile phone.

116.    In addition, on January 14, 2010, Opalewski, Vice President and General Manager of Sales and Marketing for General Chemical, emailed Milton Sundbeck, President of

Southern Ionics, to discuss arrangements for a dinner meeting.  Opalewski wrote, "With regard to dinner, happy to include the entire team or keep it to you and me.  If we do get everyone together, would still like to slip away at some point to discuss the larger issue we touched on."

### ii.        Widespread Anomalous Bidding Behavior

117.    Defendants enjoyed supra-competitive profit margins during the Conspiracy Period, not counting freight charges.  Thus, sellers of Alum could have submitted, but chose not to submit, bids at considerably lower prices and still make a profit.  Among the reasons for Defendants to agree to allocate customers was to protect their supra-competitive profit margins.

118.    A significant part of the price for Alum is the cost of shipping.  It is standard practice in the industry for suppliers of Alum to include in the quoted price the cost of shipping.  Because shipping costs are a significant part of the price of Alum, a supplier that is "freight logical," i.e., the supplier that is closest to the customer, has a built-in economic advantage over other suppliers which are materially farther away from the customer, because the freight logical supplier's shipping costs should be less than those of its competitors.  The freight logical supplier can offer a lower price at the same profit margin as other suppliers and/or a non-freight logical supplier must cut its profit margin in order to sell at a competitive price.

119.    During the Conspiracy Period, members of the conspiracy were able to maintain contracts because "competitors" with plants sufficiently close to the customer, including, for example, Plaintiff Richmond, refused to bid or submitted higher bids to customers than shipping costs would have required, in order to ensure the contracts were awarded according to the conspiracy's allocation decisions.

### iii.       Policing and Enforcement Efforts

120.    Defendants also undertook specific efforts to monitor and enforce the conspiracy.  If, either intentionally or accidentally, a "competitor" submitted a lower bid to its "competitor's"

historic customer, that would often prompt a complaint that resulted in the withdrawal of the lower bid.

121.    In addition, where a Defendant gained business at the apparent expense of its "competitor," that Defendant would often allow that "competitor" to win business from another customer to keep their respective levels of business and the conspiracy intact.

### iv.    Defendants' Actions Increased Prices Across the Industry

122.    During the Conspiracy Period, Defendants were able to maintain or increase the price of Alum at supra-competitive levels.

123.    Throughout the Conspiracy Period, Defendants told customers that the price increases for Alum flowed entirely from increases in manufacturing costs, such as the costs of raw materials.  For example, in December 2004, a representative of General Chemical told one customer that the industry was facing an "emerging alumina crisis and its impact on raw material costs.  In a nutshell, alumina is short globally and producers are accelerating price increases at unprecedented levels."

124.    In reality, however, Defendants' supra-competitive prices stemmed from their conduct described herein, including their direct and indirect discussions about prices.  In 2010, for example, General Chemical acknowledged internally that it was publicly announcing price increases which were above any raw material cost increases.

125.    As a result of Defendants' efforts described herein, including their coordination of price increases, the price of Alum increased to supra-competitive levels across the United States during the Injury Period.  For example, according to the Chemical Market Reporter, the prices of Alum increased approximately 33.8% to 38% between 1998 and 2004.

126.    These price increases contributed to Defendants' bottom-lines.  For example, between 2007 and 2008, Defendant General Chemical's sales to the water treatment market rose

34% due to, *inter alia*, higher prices for its water treatment chemicals.  The following year, price increases on Alum contributed significantly to General Chemical's profits as reported on GenTek's 2009 Form 10-K.

## D.   UNITED STATES DEPARTMENT OF JUSTICE INVESTIGATIONS

127.   Beginning in 2013, several members of the conspiracy admitted to participation in criminal antitrust violations including, *inter alia*, price fixing, bid rigging and the division of sales territory.

128.   On March 4, 2014, Defendant Chemtrade issued an Annual Information Form ("AIF")[9] for the calendar year 2013, the year it initiated its acquisition of General Chemical.  In that AIF, Chemtrade stated that it had received a leniency "marker" from the Department of Justice for its conduct regarding sales of unspecified water treatment chemicals.  Chemtrade's 2013 AIF stated:

> Chemtrade is currently a subject of an ongoing investigation by the U.S. Department of Justice concerning alleged anticompetitive conduct in the water treatment chemicals industry.  ***Chemtrade is cooperating with the investigation and has the benefit of the conditional amnesty and a leniency "marker" from the U.S. Department of Justice for its conduct regarding sales of the water treatment chemicals under investigation which General Chemical had obtained prior to the General Chemical Acquisition***.  The investigation may result in separate civil litigation being initiated against Chemtrade.  In addition, there is a risk that Chemtrade could become ineligible for a period of time to do business or bid for new contracts with certain municipal or other government customers as a consequence of its conduct, and thereby could lose some or all of its municipal and other government water treatment chemicals business in certain

---

[9]   An Annual Information Form ("AIF") is an information disclosure form that public companies trading on Canadian stock exchanges must file with the Canadian Securities Administrators ("CSA") on a regular basis.  An AIF contains a wide variety of information concerning the operation of the firm, its properties, any pending or potential legal proceedings, and certain financial matters.  An AIF is roughly equivalent to a Form 10-K in the United States.

jurisdictions for a period of time. Chemtrade does not anticipate that the costs associated with the investigation or related matters will have a material adverse impact on its business or operations. The vendors pursuant to the General Chemical Acquisition have agreed to indemnify Chemtrade for certain losses that could result from the conduct that is the subject matter of this investigation.

Chemtrade Annual Information Form for 2013 at 46 (emphasis added).

129.   On March 5, 2015, Chemtrade issued its AIF for the calendar year 2014, again

stating that it had received "conditional amnesty" from the Department of Justice for

anticompetitive conduct relating to the sale of unspecified water treatment chemicals:

Chemtrade is currently a subject of an ongoing investigation by the U.S. Department of Justice concerning alleged anticompetitive conduct in the water treatment chemicals industry. ***Chemtrade is cooperating with the investigation and has the benefit of the conditional amnesty from the U.S. Department of Justice for its conduct relating to the sale of the water treatment chemicals under investigation which General Chemical had obtained prior to the General Chemical Acquisition***. The investigation may result in separate civil litigation being initiated against Chemtrade. In addition, there is a risk that Chemtrade could become ineligible for a period of time to do business or bid for new contracts with certain municipal or other government customers as a consequence of its conduct, and thereby could lose some or all of its municipal and other governmental water treatment chemicals business in certain jurisdictions for a period of time. Chemtrade does not anticipate that the costs associated with the investigation or related matters will have a material adverse impact on its business or operations. The vendors pursuant to the General Chemical Acquisition have agreed to indemnify Chemtrade for certain losses that could result from the conduct that is the subject of this investigation.

Chemtrade Annual Information Form for 2014 at 40-41 (emphasis added).

130.   On March 4, 2016, Chemtrade issued its AIF for the calendar year 2015, again

stating that it had received "conditional amnesty" from the Department of Justice for

anticompetitive conduct relating to the sale of unspecified water treatment chemicals:

Chemtrade is currently a subject of an ongoing investigation by the U.S. Department of Justice concerning alleged anticompetitive

conduct in the water treatment chemicals industry. The investigation commenced prior to Chemtrade's acquisition of General Chemical. ***Chemtrade is cooperating with the investigation and has the benefit of the conditional amnesty from the U.S. Department of Justice for its conduct regarding sales of the water treatment chemicals under investigation which General Chemical had obtained prior to the General Chemical Acquisition***. The investigation has resulted in numerous separate class action lawsuits initiated against Chemtrade, which have been consolidated into a single New Jersey proceeding. In addition, there is a risk that Chemtrade could become ineligible for a period of time to do business or bid for new contracts with certain municipal or other government customers as a consequence of its conduct, and thereby could lose some or all of its municipal and other government water treatment chemicals business in certain jurisdictions for a period of time. The vendors pursuant to the General Chemical Acquisition have agreed to indemnify Chemtrade for certain losses that could result from the conduct that is the subject of this investigation. As a result, Chemtrade does not anticipate that the damages and costs associated with the investigation, the class action law suits or related matters will have a material adverse impact on its business or operations. However, it is possible that the damages and costs could exceed the indemnification amount or that Chemtrade could be unsuccessful in collecting on its indemnity, in which case these matters would have a material adverse effect on Chemtrade's financial condition.

Chemtrade Annual Information Form for 2015 at 32-33 (emphasis added).

131.    On March 2, 2017, Chemtrade issued its AIF for the calendar year 2016, again stating that it had received "conditional amnesty" from the Department of Justice for anticompetitive conduct relating to the sale of unspecified water treatment chemicals:

Chemtrade is currently a subject of an ongoing investigation by the U.S. Department of Justice concerning alleged anticompetitive conduct in the water treatment chemicals industry. The investigation commenced prior to Chemtrade's acquisition of General Chemical. ***Chemtrade is cooperating with the investigation and has the benefit of the conditional amnesty from the U.S. Department of Justice for its conduct regarding sales of the water treatment chemicals under investigation which General Chemical had obtained prior to the General Chemical Acquisition***. The investigation has resulted in numerous separate class action lawsuits initiated against Chemtrade, which have been consolidated into a single New Jersey proceeding by direct

purchasers and a second proceeding by indirect purchasers. In addition, there is a risk that Chemtrade could become ineligible for a period of time to do business or bid for new contracts with certain municipal or other government customers as a consequence of its conduct, and thereby could lose some or all of its municipal and other government water treatment chemicals business in certain jurisdictions for a period of time. The vendors pursuant to the General Chemical Acquisition have agreed to indemnify Chemtrade for certain losses that could result from the conduct that is the subject of this investigation. As a result, Chemtrade does not anticipate that the damages and costs associated with the investigation, the class action law suits or related matters will have a material adverse impact on its business or operations. However, it is possible that the damages and costs could exceed the indemnification amount or that Chemtrade could be unsuccessful in collecting on its indemnity, in which case these matters would have a material adverse effect on Chemtrade's financial condition.

Chemtrade Annual Information Form for 2016 at 36-37 (emphasis added).

132.    The significance of Chemtrade obtaining conditional amnesty under the

Department of Justice's corporate leniency program is explained in a Frequently Asked

Questions published by the Department of Justice as follows:

> Does a leniency applicant have to admit to a criminal violation of the antitrust laws before receiving a conditional leniency letter?
>
> *Yes*.    The Division's leniency policies were established for corporations and individuals "reporting their illegal antitrust activity," and the policies protect leniency recipients from criminal conviction. ***Thus, the applicant must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes before it will receive a conditional leniency letter***.    Applicants that have not engaged in criminal violations of the antitrust laws have no need to receive leniency protection from a criminal violation and will receive no benefit from the leniency program.

Frequently Asked Questions Regarding the Antitrust Division's Leniency Program and Model

Leniency Letters (November 19, 2008) at 6 (emphasis added).

133.    On October 27, 2015, the Department of Justice announced that Reichl, a former senior executive at General Chemical (which had been acquired by Chemtrade in 2014), had agreed to plead guilty to Sherman Act violations for his role in a conspiracy to suppress and eliminate competition in the sale and marketing of Alum by agreeing to rig bids and allocate customers for, and to fix, stabilize, increase, and maintain the price of, Alum.[10]

134.    As noted in Paragraph 11, *supra*, Reichl was a Vice President of Sales and Marketing at General Chemical between 2006 and 2010, and also served as the General Manager of Water Chemicals at General Chemical during the Conspiracy Period.  In both positions, Reichl oversaw the sale and marketing of Alum, and was responsible for pricing and strategy, analyzing proposals, determining prices, approving bid and price proposals, and supervising other General Chemical sales and marketing employees.[11]

135.    According to the criminal Information filed against Reichl on September 29, 2015 (which was unsealed on October 27, 2015), from at least as early as 1997 and continuing through approximately July 2010, Reichl and unidentified co-conspirators "entered into and engaged in a combination and conspiracy to suppress and eliminate competition in the sale and marketing of [Alum] by agreeing to rig bids and allocate customers for, and to fix, stabilize, and maintain the price of [Alum] sold to municipalities and pulp and paper companies in the United States . . . in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1."  The Information described the conspiracy that Reichl and his unidentified co-conspirators participated in as a "continuing agreement, understanding, and concert of action among Reichl and his co-conspirators."

---

[10]    Announcement available at https://www.justice.gov/opa/pr/former-executive-admits-guilt-conspiracy-affecting-water-treatment-chemicals; *see also United States v. Reichl*, No. 2:15-cr-00554-JLL, Plea Agreement, Dkt. 5 (D.N.J.).

[11]    *United States v. Reichl*, No. 2:15-cr-00554-JLL, Information, Dkt. 1 (D.N.J.).

136.     In order to form and carry out their unlawful conspiracy with regard to Alum, Reichl and his co-conspirators, as well as GEO, did those things that they combined and conspired to do, including, *inter alia*:

a.   participating in meetings and conversations to discuss each other's Alum business;

b.   agreeing to "stay away" from each other's "historical" customers by not pursuing the business of those customers;

c.   tracking bid and pricing histories to determine which accounts were the "historical" customers of each co-conspirator or other supplier of Alum, so as to determine whether to pursue a particular contract or to submit an intentionally losing or "throw away" bid or price quotation;

d.   submitting intentionally losing or "throw away" bids or price quotations to each other's "historic" Alum customers;

e.   discussing the price to be quoted to a customer by the intended winner to determine the amount of the intended loser's intentionally losing or "throw away" bid or price quotation;

f.   upon request of a co-conspirator, withdrawing winning bids inadvertently submitted to co-conspirators' "historical" customers;

g.   where a co-conspirator could not withdraw its inadvertent winning bid, bidding to lose on one of its own customers to compensate for the loss of that "historical" customer; and

h.   instructing new employees as to how to determine whether and how to bid on or quote a price for the business of Alum customers so as to comport with the agreement not to compete.

137.   On February 17, 2016, a federal grand jury indicted Defendants Opalewski and Steppig – senior executives at Defendants General Chemical and GEO, respectively – on similar charges that they participated in an unlawful conspiracy to suppress and eliminate competition in the sale and marketing of Alum by agreeing to rig bids and allocate customers for, and to fix, stabilize, increase, and maintain the price of, Alum.[12]

138.   As noted in Paragraph 12, *supra*, Opalewski held high-level executive positions at Defendant General Chemical in which he was responsible for the sale and marketing of water treatment chemicals, including Alum.  These positions included:  Vice President of Sales and Marketing from approximately 2005 to 2006, Vice President and General Manager from approximately 2006 to 2009, and President from approximately 2009 to 2011.

139.   The Indictment alleged that Opalewski knowingly entered into and participated in the conspiracy from at least as early as 2005 and continuing until at least February 2011.

140.   As noted in Paragraph 13, *supra*, Steppig held high-level executive positions at Defendant GEO in which he was responsible for the sale and marketing of water treatment chemicals, including Alum.  These positions included:  National Sales Manager for pulp and paper water treatment chemicals from approximately 1997 to August 2006, and Director of Sales and Marketing for water treatment chemicals from approximately August 2006 to the present.

141.   The Indictment alleged Steppig knowingly entered into and participated in the conspiracy from at least as early as 1998 and continuing until at least February 2011.

---

[12]      *United States v. Opalewski*, 2:16-cr-00065-JLL, Indictment, Dkt. 1 (D.N.J.).

142.     The Indictment described the unlawful conspiracy that Opalewski and Steppig participated in as "consist[ing] of a continuing agreement, understanding, and concert of action among [Opalewski and Steppig] and their co-conspirators, the substantial terms of which were to rig bids and allocate customers for, and to fix, stabilize, and maintain the price of [Alum] sold to municipalities and pulp and paper companies in the United States."

143.     Similar to the Reichl Information, the Opalewski and Steppig Indictment stated that Opalewski and Steppig actually did those things that they conspired to do for the purpose of forming and carrying out their unlawful conspiracy, including, *inter alia*:

a.  participating in meetings and conversations to discuss each other's Alum business;

b.  agreeing to "stay away" from each other's "historical" customers by not pursuing the business of those customers;

c.  tracking bid and pricing histories to determine which accounts were the "historical" customers of each co-conspirator or other supplier of Alum, so as to determine whether to pursue a particular contract or to submit an intentionally losing or "throw away" bid or price quotation;

d.  submitting intentionally losing or "throw away" bids or price quotations to each other's "historic" Alum customers;

e.  discussing the price to be quoted to a customer by the intended winner to determine the amount of the intended loser's intentionally losing or "throw away" bid or price quotation;

f.  upon request of a co-conspirator, withdrawing winning bids inadvertently submitted to co-conspirators' "historical" customers;

g.   where a co-conspirator could not withdraw its inadvertent winning bid, bidding to

lose on one of its own customers to compensate for the loss of that "historical"

customer; and

h.   instructing new employees as to how to determine whether and how to bid on or

quote a price for the business of Alum customers so as to comport with the

agreement not to compete.

144.    On June 16, 2016, the Department of Justice announced that GEO had agreed to

plead guilty to Sherman Act violations for its role in a conspiracy to suppress and eliminate

competition in the sale and marketing of Alum by agreeing to rig bids and allocate customers for,

and to fix, stabilize, increase, and maintain the price of, Alum.[13]

145.    According to the criminal Information filed against GEO on June 16, 2016,[14] from

at least as early as 1997 and continuing through approximately February 2011, GEO and

unidentified co-conspirators "entered into and engaged in a combination and conspiracy to

suppress and eliminate competition in the sale and marketing of [Alum] by agreeing to rig bids

and allocate customers for, and to fix, stabilize, and maintain the price of [Alum] sold to

municipalities and pulp and paper companies in the United States . . . in violation of Section 1 of

the Sherman Act, 15 U.S.C. § 1."  The Information described the conspiracy that GEO and its

unidentified co-conspirators participated in as a "continuing agreement, understanding, and

concert of action among GEO and its co-conspirators."

---

[13]    Announcement available at https://www.justice.gov/opa/pr/water-treatment-chemicals-manufacturer-pleads-guilty-conspiracy-aimed-eliminating-competition; *see also United States v. GEO Specialty Chem. Inc.*, No. 2:16-cr-00290-JLL, Plea Agreement, Dkt. 8 (D.N.J.).

[14]    *United States v. GEO Specialty Chem. Inc.*, No. 2:16-cr-00290-JLL, Information, Dkt. 4 (D.N.J.).

146.    In order to form and carry out their unlawful conspiracy with regard to Alum, GEO and its co-conspirators did those things that they combined and conspired to do, including, *inter alia*:

a.   participating in meetings and conversations to discuss each other's Alum business;

b.   agreeing to "stay away" from each other's "historical" customers by not pursuing the business of those customers;

c.   tracking bid and pricing histories to determine which accounts were the "historical" customers of each co-conspirator or other supplier of Alum, so as to determine whether to pursue a particular contract or to submit an intentionally losing or "throw away" bid or price quotation;

d.   submitting intentionally losing or "throw away" bids or price quotations to each other's "historic" Alum customers;

e.   discussing the price to be quoted to a customer by the intended winner to determine the amount of the intended loser's intentionally losing or "throw away" bid or price quotation;

f.   upon request of a co-conspirator, withdrawing winning bids inadvertently submitted to co-conspirators' "historical" customers;

g.   where a co-conspirator could not withdraw its inadvertent winning bid, bidding to lose on one of its own customers to compensate for the loss of that "historical" customer; and

h.   instructing new employees as to how to determine whether and how to bid on or quote a price for the business of Alum customers so as to comport with the agreement not to compete.

147.   Although Reichl and GEO were among the first identified conspirators to plead guilty to Sherman Act violations,[15] the Department of Justice has indicated that various other persons and entities participated as co-conspirators in the collusive anticompetitive scheme to fix the price of and rig bids for Alum.  In the press release announcing Reichl's guilty plea, Assistant Attorney General Bill Baer of the Department of Justice's Antitrust Division stated that the Department of Justice was "continu[ing] to work with our partners at the FBI to hold offenders in this industry criminally accountable."[16]  Similarly, in the press release announcing the Opalewski and Steppig indictment, Assistant Attorney General Baer stated that the charges brought against Opalewski and Steppig reflected the Department of Justice's "ongoing efforts to hold accountable those who conspire to cheat their customers responsible for their crimes."[17]  In light of these statements, the Department of Justice and FBI's investigation into anticompetitive conduct in the Alum industry is ongoing, making it likely that additional criminal charges against other currently unidentified participants in the unlawful Alum conspiracy are forthcoming.

---

[15]   On February 24, 2016, Opalewski and Steppig both pleaded not guilty to the Sherman Act violation with which the Indictment charged them.

[16]   https://www.justice.gov/opa/pr/former-executive-admits-guilt-conspiracy-affecting-water-treatment-chemicals.

[17]   https://www.justice.gov/opa/pr/two-executives-charged-conspiring-eliminate-competition-supply-water-treatment-chemicals; *see also* https://www.justice.gov/opa/pr/water-treatment-chemicals-manufacturer-pleads-guilty-conspiracy-aimed-eliminating-competition (In press release announcing GEO Specialty's guilty plea, Principal Deputy Assistant Attorney General Renata Hesse of the Justice Department's Antitrust Division stated:  "This prosecution continues our efforts to hold criminally responsible those who collude to cheat their customers").

### VIII.    PLAINTIFF RICHMOND'S ALUM PURCHASING HISTORY

148.    Plaintiff Richmond's experience purchasing Alum demonstrates the profound impact of Defendants' anticompetitive conspiracy on municipal budgets.

149.    Throughout the Injury Period, Plaintiff Richmond purchased Alum from General Chemical.

150.    Despite the fact that Plaintiff Richmond solicited bids from other Alum suppliers on multiple occasions, General Chemical was always the winning bidder.

151.    For example, in July of 2002, General Chemical increased the price of Alum from $108.50 to $116.50 per ton, an increase of 7.4%.

152.    Beginning in July of 2004, General Chemical began to increase the price of Alum by larger percentages and more frequently.  For example, in July of 2004, General Chemical increased the price of Alum from $115.80 to $131.80 per ton, an increase of 13.8%.

153.    In July of 2005, General Chemical increased the price of Alum from $131.80 to $151.80, an increase of 15.2%.

154.    In July of 2007, General Chemical increased the price of Alum from $151.80 to $176.60, an increase of 16.3%.

155.    In 2008, General Chemical increased the price of Alum twice.  In January of 2008, General Chemical increased the price of Alum from $176.60 to $191.60, an increase of 8.5%. Then in July of 2008, General Chemical increased the price of Alum from $191.60 to $401.60, an increase of 109.6%.

156.    Since the increase in July of 2008, the price of Alum has remained at artificially inflated levels of more than $300 per ton.

157.    Despite the dramatic price increases, other Alum producers did not provide bids that were lower than General Chemical's.

158.     Over the course of the Injury Period, Plaintiff Richmond has purchased millions of dollars of Alum from one or more of the Defendants.

159.     As a result of the conspiracy among Defendants, Plaintiff Richmond has been forced to pay supra-competitive prices for Alum.  From 2000 to 2009, the price Plaintiff Richmond paid for Alum nearly quadrupled from $108.50 to $401.60 per dry ton.

## IX.     FRAUDULENT CONCEALMENT

160.     Defendants and their co-conspirators engaged in a successful unlawful conspiracy which, by its very nature, was self-concealing.

161.     Defendants and their co-conspirators used non-public means of communication, such as private meetings, to conceal their agreements to eliminate competition by, *inter alia*, fixing prices, rigging bids, and allocating customers for Alum in the United States.

162.     Defendants and their co-conspirators wrongfully concealed and carried out their illegal conduct in a manner that was designed to, and did, preclude detection.

163.     Plaintiff Richmond did not have actual or constructive knowledge of Defendants' unlawful scheme until sometime after the Reichl guilty plea was announced on October 27, 2015.

164.     Because Defendants' anticompetitive conduct was both self-concealing and affirmatively concealed by Defendants, neither Plaintiff Richmond nor any other Alum purchasers learned, or could have learned or discovered, the operative facts giving rise to this Complaint until sometime after October 27, 2015, when the Department of Justice announced the Reichl guilty plea.  No information, actual or constructive, was ever made available to Plaintiff Richmond or any other Alum purchasers that would have led a reasonably diligent person to investigate whether an unlawful conspiracy with regard to Alum existed prior to October 27, 2015.

165.     Chemtrade's disclosures in the 2014 and 2015 AIFs it filed with Canadian securities regulators that it had received conditional amnesty and a "leniency" marker from the United States Department of Justice "for its conduct relating to the sale of water treatment chemicals" were not sufficient to put Plaintiff Richmond or any other reasonable United States purchaser of Alum on notice that an extensive conspiracy to fix the price of and rig bids for Alum may have existed.  Chemtrade's AIFs only generally referred to conduct relating to "water treatment chemicals," and did not specify Alum.  Additionally, the AIFs were filed with Canadian, not United States, securities regulators.  Expecting municipalities to monitor the foreign regulatory filings of parent companies of every contractor they deal with for vague allusions to potential unlawful conduct that occurred in the United States is a bridge too far.

166.     Not only did Defendants conduct their conspiracy in secret, they also affirmatively misled their customers, including Plaintiff Richmond, as to the existence of their unlawful conspiracy.

167.     Defendants falsely certified in affidavits accompanying their bids that they had arrived at their quoted prices independently, thereby affirmatively concealing the Defendants' unlawful conspiracy.

168.     For example, the 2008 Richmond Alum contract required bidders to sign an affidavit providing:

>    ETHICS IN PUBLIC CONTRACTING.  By signing this solicitation, the bidder/offeror certifies that he has not violated any provisions of Federal law, the Code of Virginia, the Richmond City Code or Charter.  The bidder/offeror certifies that his bid/proposal is made without collusion or fraud and that he has not offered or received any kickbacks or inducements from any other bidder/offeror, supplier, manufacturer or subcontractor in connection with his bid/proposal . . . .  The bidder/offeror agrees that if such warranty is in any way respect breached, he will pay to the City the full

price agreed by the City to be paid for the supplies, materials, equipment or services to be furnished under his bid or proposal.[18]

169.    In announcing price increases for Alum, Defendants and their co-conspirators often falsely asserted that such increases were attributable to higher raw material and energy costs, thereby providing an excuse concealing the true cause of these price increases – the Defendants' unlawful conspiracy – from Alum purchasers.

170.    These affirmative misrepresentations were meant to, and did, prevent Plaintiff Richmond from discovering the actual reason for the artificially inflated prices.

171.    Upon information and belief, Defendants took additional affirmative acts of concealment, including ensuring that there were few written communications regarding their conspiracy and agreement.

172.    Plaintiff Richmond exercised due diligence by requiring the signed affidavits accompanying each bid and by inquiring as to the basis of any price increases.

173.    Because of the self-concealing nature of Defendants' unlawful conspiracy and the affirmative acts of concealment described above, Plaintiff Richmond was unaware of Defendants' unlawful conspiracy and was unaware that it was paying artificially inflated prices for Alum during the Injury Period.  The self-concealing nature of Defendants' conspiracy, coupled with the affirmative acts of concealment described above, prevented Plaintiff Richmond from discovering through reasonable diligence that Defendants had engaged in the unlawful conspiracy described herein.  Accordingly, Defendants' fraudulent concealment tolled all statutes of limitations applicable to Plaintiff Richmond's claims.  No applicable statute of limitations

---

[18]    *See also* Virginia Public Procurement Act, VA Code Ann. § 2.2-43672 (C) ("No person shall demand or receive any payment, loan, subscription, advance, deposit of money, services or anything of value in return for an agreement not to compete on a public contract").

began to run on Plaintiff Richmond's claims until, at the earliest, October 27, 2015, the day the

Reichl guilty plea and the unlawful conspiracy with regard to Alum became public knowledge.

## COUNT I

### SHERMAN ACT, 15 U.S.C. § 1:
### CONSPIRACY IN RESTRAINT OF TRADE

174.    Plaintiff Richmond incorporates by reference the preceding paragraphs as though

set forth fully herein.

175.    Defendants engaged in an unlawful conspiracy by agreeing to rig bids and

allocate customers for, and to fix, stabilize, inflate, and maintain the price of, Alum sold to

companies and municipalities in the United States, in violation of Section 1 of the Sherman Act,

15 U.S.C. § 1.

176.    The conspiracy alleged herein is a per se violation of Section 1 of the Sherman

Act.

177.    Alternatively, the conspiracy alleged herein is a rule of reason violation of Section

1 of the Sherman Act.

178.    There was no procompetitive business justification for Defendants' unlawful

conspiracy.  Even if there were some ostensible procompetitive justification, the Defendants'

conduct was not the least restrictive alternative method to achieve such a purpose.

179.    Defendants furthered and effectuated their conspiracy, *inter alia*, by the following

acts:

     a.    participating in secret communications, discussions, and meetings in the United

        States and elsewhere regarding each other's Alum business;

b.  agreeing, during these communications, discussions, and meetings, to "stay away" from each other's "historical" customers by not pursuing the business of those customers;

c.  tracking bid and pricing histories to determine which accounts were the "historical" customers of each co-conspirator and Alum supplier, so as to determine whether to pursue a particular contract or to submit an intentionally losing or "throw away" bid or price quotation;

d.  submitting intentionally losing or "throw away" bids or price quotations to each other's "historical" Alum customers;

e.  discussing and agreeing to set price floors that pre-determined "winning" bidders would quote to a customer, so as to aid co-conspirators in formulating intentionally losing or "throw away" bids;

f.  upon request of a co-conspirator, withdrawing winning bids inadvertently submitted to co-conspirators' "historical" customers;

g.  where a co-conspirator could not withdraw its inadvertent winning bid, bidding to lose on one of its own customers to compensate for the loss of that "historical" customer;

h.  instructing new employees as to how to determine whether and how to bid on or quote a price for the business of Alum customers so as to comport with the agreement not to compete; and

i.  selling Alum to customers at collusive and non-competitive prices in the United States.

180.    As a result of Defendants' unlawful conspiracy, Plaintiff Richmond sustained damages to its business or property.  The full amount of such damages will be determined after discovery and upon proof at trial.

181.    The conspiracy had its intended effect, and Defendants benefitted by reaping inflated revenues from their supra-competitive Alum pricing.

182.    Defendants' unlawful conduct as alleged herein poses a significant, continuing threat of antitrust injury for which injunctive relief is appropriate under Section 16 of the Clayton Antitrust Act.

## COUNT II

### VIRGINIA ANTITRUST ACT, VA. CODE ANN. § 59.1-9.5
### CONSPIRACY IN RESTRAINT OF TRADE

183.    Plaintiff Richmond incorporates by reference the preceding paragraphs as though set forth fully herein.

184.    Defendants engaged in an unlawful conspiracy by agreeing to rig bids and allocate customers for, and to fix, stabilize, inflate, and maintain the price of Alum sold to companies and municipalities in, among other places, the State of Virginia, in violation of the Virginia Antitrust Act, VA. CODE ANN. § 59.1-9.5.

185.    The conspiracy alleged herein is a per se violation of the Virginia Antitrust Act.

186.    Alternatively, the conspiracy alleged herein is a rule of reason violation of the Virginia Antitrust Act.

187.    There was no procompetitive business justification for Defendants' unlawful conspiracy.  Even if there were some ostensible procompetitive justification, the Defendants' conduct was not the least restrictive alternative method to achieve such a purpose.

188.    Defendants furthered and effectuated their conspiracy, *inter alia*, by the following acts:

a.    participating in secret communications, discussions, and meetings in the United States and elsewhere regarding each other's Alum business;

b.    agreeing, during these communications, discussions, and meetings, to "stay away" from each other's "historical" customers by not pursuing the business of those customers;

c.    tracking bid and pricing histories to determine which accounts were the "historical" customers of each co-conspirator and Alum supplier, so as to determine whether to pursue a particular contract or to submit an intentionally losing or "throw away" bid or price quotation;

d.    submitting intentionally losing or "throw away" bids or price quotations to each other's "historical" Alum customers;

e.    discussing and agreeing to set price floors that pre-determined "winning" bidders would quote to a customer, so as to aid co-conspirators in formulating intentionally losing or "throw away" bids;

f.    upon request of a co-conspirator, withdrawing winning bids inadvertently submitted to co-conspirators' "historical" customers;

g.    where a co-conspirator could not withdraw its inadvertent winning bid, bidding to lose on one of its own customers to compensate for the loss of that "historical" customer;

h.  instructing new employees as to how to determine whether and how to bid on or

quote a price for the business of Alum customers so as to comport with the

agreement not to compete; and

i.  selling Alum to customers at collusive and non-competitive prices in the United

States, including in Virginia.

189.    As a result of Defendant's unlawful conspiracy, Plaintiff Richmond sustained

damages to its property.  The full amount of such damages will be determined after discovery

and upon proof at trial.

190.    The conspiracy had its intended effect, and Defendants benefitted by reaping

inflated revenues from their supra-competitive Alum pricing.

191.    Defendants' unlawful conduct as alleged herein poses a significant, continuing

threat of antitrust injury for which injunctive relief is appropriate under Section 16 of the Clayton

Antitrust Act.

<u>**COUNT III**</u>

**COMMON LAW FRAUD**
**(Against Defendant General Chemical)**

192.    Plaintiff Richmond incorporates by reference the preceding paragraphs as though

set forth fully herein.

193.    Defendant General Chemical used deception, used a deceptive act or practice,

used fraud, used false pretense, made a false promise, made a misrepresentation, and/or

concealed, suppressed, or omitted material facts in connection with the sale of merchandise (in

this case, Alum) to Plaintiff Richmond.  The acts and omissions that were part and parcel of

Defendants' unlawful conspiracy constitute unlawful practices in violation of VA. CODE ANN.

§ 59.1-9.5.

194.    Defendant General Chemical repeatedly represented, both explicitly and implicitly, that the Alum prices being offered to Plaintiff Richmond were based on a competitive market, rather than collusively set pursuant to Defendants' unlawful conspiracy described above.

195.    Defendant General Chemical's misrepresentations as alleged herein were material, in that they concealed that Defendants had unlawfully set Alum prices through Defendants' unlawful conspiracy described above.

196.    Plaintiff Richmond detrimentally relied on Defendant General Chemical's deception, deceptive acts and practices, fraud, false pretenses, false promises, misrepresentations, and/or concealment, suppression, or omissions of material facts when it decided to execute contracts to purchase Alum.

197.    The reliance of Plaintiff Richmond was reasonable, in that Defendants' unlawful conspiracy described above extended throughout the Alum industry and had the purpose and effect of concealing the true state of affairs from Plaintiff Richmond.

198.    Defendant General Chemical committed the acts and omissions alleged herein deliberately and maliciously, with ill-will and an evil intent to inflict monetary harm on Plaintiff Richmond.

199.    As a result of Defendants' unlawful conspiracy described above, Plaintiff Richmond suffered damages in the form of artificially inflated prices that it paid for Alum.

200.    Plaintiff Richmond reserves the right to add additional defendants as information is developed as to other parties.

## COUNT IV

**BREACH OF CONTRACT**
**(Against Defendant General Chemical)**

201.     Plaintiff Richmond incorporates by reference the preceding paragraphs as if set forth fully herein.

202.     Beginning at least as early as 2008, Plaintiff Richmond's Alum supply contracts incorporated a term requiring the bidder to certify "that his bid/proposal is made without collusion or fraud and that he has not offered or received any kickbacks or inducements from any other bidder/offeror, supplier, manufacturer or subcontractor in connection with his bid/proposal . . . ." Plaintiff Richmond's Alum supply contracts further provided that "the bidder/offeror agrees that if such warranty is in any respect breached, he will pay to the City the full price agreed by the City to be paid for the supplies, materials, equipment or services to be furnished under his bid or proposal."

203.     By submitting bids that were collusively set and predetermined as a part of the unlawful conspiracy described above, Defendant General Chemical breached its contractual warranties that any bids submitted were "made without collusion" and that the bidder had not "offered or received any kickbacks or inducements from any other bidder/offer, supplier, manufacturer or subcontractor in connection with his bid/proposal."

204.     Plaintiff Richmond suffered injury by reason of such conduct and is entitled to recover damages from Defendant General Chemical therefore.

205.     Plaintiff Richmond reserves the right to add additional defendants as information is developed as to other parties.

## COUNT V

### RESTITUTION/DISGORGEMENT/UNJUST ENRICHMENT
### (Against Defendant General Chemical)

206.     Plaintiff Richmond incorporates by reference the preceding paragraphs as if set forth fully herein.

207.     It would be inequitable for the Defendant General Chemical to be allowed to retain the benefits that it obtained from its illegal agreements, manipulative acts and other unlawful conduct described herein, at the expense of Plaintiff Richmond.

208.     Plaintiff Richmond is entitled to the establishment of a constructive trust impressed upon the benefits to Defendant General Chemical from its unjust enrichment and inequitable conduct.

209.     Alternatively or additionally, Defendant General Chemical should pay restitution of its own unjust enrichment to Richmond.

210.     Plaintiff Richmond reserves the right to add additional defendants as information is developed as to other parties.

## PRAYER FOR RELIEF

For the foregoing reasons, Plaintiff Richmond respectfully requests that this Court enter judgment in its favor, and against Defendants, jointly and severally, as follows:

a.     That the Defendants' conspiracy and the acts performed in furtherance thereof be adjudged to have violated Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1;

b.     With respect to the state law claims asserted herein (Counts II – V), that the Defendants' conduct be adjudged to have violated Virginia state law;

c.     That the Defendants be preliminarily and permanently enjoined and restrained from continuing and maintaining the conspiracy described herein;

d.      That Defendants pay to Plaintiff Richmond compensatory damages to be determined at trial in an amount exceeding $5,000,000.00;

e.      That Defendants pay enhanced damages to Plaintiff Richmond of treble the amount of compensatory damages caused by Defendants' violation of federal and state antitrust laws, and in accordance with such laws;

f.      That Defendant General Chemical pay punitive damages to Plaintiff Richmond for their intentional and malicious acts, in an amount to be determined at trial;

g.      That Defendant General Chemical pay restitution to Plaintiff Richmond, in an amount to be determined at trial;

h.      That Defendant General Chemical refund the full price paid by Plaintiff Richmond for its Alum supply contracts, in an amount to be determined at trial;

i.      That Defendants pay pre-judgment and post-judgment interest on the damages awarded;

j.      That Defendants pay Plaintiff Richmond its costs in bringing this action, including its reasonable attorney's fees and expenses, associated with bringing and prosecuting this action, as provided by law; and

k.      That Plaintiff Richmond be awarded such other relief as may be in the interests of justice.

Dated:  June 5, 2017

Respectfully submitted,


/s/ Constantinos G. Panagopoulos
Constantinos Panagopoulos
(VA #33356)
**BALLARD SPAHR LLP**
1909 K Street, NW, 12th Floor
Washington, DC 20006
(202) 661-2200

Jay N. Fastow
Justin W. Lamson
**BALLARD SPAHR LLP**
919 Third Avenue, 37th Floor
New York, NY 10022
(212) 223-0200

Edward D. Rogers
Jason A. Leckerman
**BALLARD SPAHR LLP**
1735 Market Street, 51st Floor
Philadelphia, PA 19103
(215) 665-8500


*Attorneys for Plaintiff, City of Richmond*


## JURY DEMAND

Pursuant to RULE 38(b) of the FEDERAL RULES OF CIVIL PROCEDURE, Plaintiff Richmond hereby demands trial by jury in this action.